UNITED CIGAR STORES CO. *et al. v.* UNITED STATES (No. 952).[1]

1. "FANCY."

"Fancy" is the antonym of "plain," "common," "ordinary," "staple," and to say that a thing is "fancy" implies that it has a value or has characteristics not found in the article of simpler type.

2. FANCY MATCHES, WHAT NOT.

No commercial designation is shown. The goods have no quality which is not found in the ordinary safety match of trade, and they have the same common use. The duty imposed on fancy matches was intended to fall on matches that served some purpose not answered by the ordinary article. The importation is dutiable at three-fourths of 1 cent per thousand under paragraph 436, tariff act of 1909.

United States Court of Customs Appeals, March 25, 1913.

APPEAL from Board of United States General Appraisers, Abstract 28911 (T. D. 32645), Abstract 28971 (T. D. 32655), and Abstract 29212 (T. D. 32681).

[Reversed.]

*Comstock & Washburn* for appellants.

*William L. Wemple,* Assistant Attorney General (*William K. Payne,* Deputy Assistant Attorney General, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

The merchandise involved in this appeal was classified by the collector of customs at the port of New York as fancy matches and assessed for duty at 35 per cent ad valorem under that part of paragraph 436 of the tariff act of 1909 which reads as follows:

436. * * * Wax and fancy matches and tapers, thirty-five per centum ad valorem.

The importers claimed by protest that the goods were "matches, friction or lucifer, of all descriptions, * * * imported otherwise than in boxes containing not more than one hundred matches

each," and that they were therefore dutiable at three-fourths of 1 cent per 1,000 matches under that part of said paragraph which reads as follows:

436. Matches, friction or lucifer, of all descriptions, * * * when imported otherwise than in boxes containing not more than one hundred matches each, three-fourths of one cent per one thousand matches; * * *.

The importation consists of matches made of thin flat sticks tipped with some ignitible composition colored yellow. The wood from which these matches are made is first cut into flakes about 2 inches long, an inch wide, and one-sixteenth of an inch thick. Each flake is stained red and cut into 12 pointed splints joined together at the bottom by a common wooden base from which they have not been completely severed. After tipping the splints the flakes are made up in pairs and pasted to a paper folder or wrapper in such a way that they may be conveniently carried in the vest pocket and the splints readily broken off one at a time as required. The folder or wrapper is provided with the specially prepared striking surface required for the ignition of the safety match and is so designed that it serves the double purpose of protecting the matches from injury and of advertising various kinds of goods.

The Board of General Appraisers found that the goods were fancy matches within the meaning of paragraph 436 and that they were therefore dutiable as assessed by the collector. The protests were accordingly overruled and the importers appealed.

Fancy matches and safety matches were not provided for *eo nomine* in the act of 1897, and while that act was in force all matches were classified under paragraph 423 thereof as "matches, friction or lucifer, of all descriptions." Paragraph 423 is as follows:

423. Matches, friction or lucifer, of all descriptions, per gross of one hundred and forty-four boxes, containing not more than one hundred matches per box, eight cents per gross; when imported otherwise than in boxes containing not more than one hundred matches each, one cent per one thousand matches.

This paragraph was amended in such a way by paragraph 436 of the present tariff act that fancy matches were under that designation burdened with a duty of 35 per cent ad valorem, and the pending controversy arises from the fact that the collector of customs at the port of New York classified the importation here involved as fancy matches.

The provision for fancy matches in the new law seems to have been first subjected to interpretation at the instance of G. W. Sheldon & Co., of Chicago, who protested that safety matches imported by the firm as agents for an unknown consignee were fancy matches and therefore dutiable at a higher rate of duty than that assessed by the collector. On the hearing of that protest the evidence adduced by the Government and the importers proved to a conclusion that the designation "fancy matches" had never been used by dealers in matches and that it was a term wholly unknown

to the trade. Nevertheless the witnesses on both sides testified with singular accord that safety matches and all matches which required a specially prepared surface to be struck should be regarded as "fancy matches" rather than as friction or lucifer matches, which might be struck anywhere. Evidently on the assumption that there was no real contest between the Government and the importers the Board of General Appraisers declined to make a decision upon this testimony, and of its own motion cited a number of witnesses who testified to their personal understanding of "fancy matches," although they all agreed that the term was never used in the match business. The board, after consideration of the evidence originally taken and that produced on its own motion, held in effect: (1) That safety matches put up in boxes or with undyed sticks in plain unprinted booklets were not fancy matches; (2) that safety matches with colored heads and dyed sticks or colored paper stems put up in printed booklets were fancy matches; (3) that wind matches or other matches serving the purposes of matches but designed to meet special conditions were fancy matches; (4) that so-called matches which did not serve the purposes of matches but which were designed to produce beautiful or scintillating effects were fireworks. (T. D. 31017.)

The matches now under consideration are matches of the second class—that is to say, matches with colored heads and stained sticks or colored paper stems, put up in printed booklets. The protests directed to matches of this kind and claiming that they should not be classified as "fancy matches" were submitted to the board on the testimony taken in the Sheldon case and on the testimony of five additional witnesses produced by the appellants at the hearing. These witnesses testified that the phrase "fancy matches" had no special meaning in the trade, and to that extent confirmed the evidence in the Sheldon case. In this case, as in the Sheldon case, each witness was allowed to give his own idea of what constituted a fancy match, with the result that there were nearly as many different ideas of a fancy match as there were witnesses. Some thought that a fancy match was a superior match—a match which would burn without an afterglow and which could be struck without breaking the stick or removing the head. Others thought that it was one which had some special value or upon which some special labor had been expended or which was more expensive than the ordinary match. Still others ventured the opinion that it was one which was not commonly used.

The witnesses whose testimony was submitted to the board for consideration were competent to establish any special meaning which the designation "fancy match" had in the trade, but, failing that, none of them was competent to testify as to what was commonly and generally understood by that expression. The special meaning which words and phrases have in trade, commerce, and the arts

and sciences may in a proper case be proved by the testimony of witnesses. The ordinary signification of the words of common speech, however, is a matter of law within the judicial knowledge and is not usually made the subject of proof. United States *v.* Nordlinger (121 Fed , 690, 693); Toplitz *v.* Hedden (33 Fed., 617); Marvel *v.* Merritt (116 U. S., 11–12).

In common parlance a fancy article is one which is out of the ordinary; that is to say, one which has some special quality, virtue, or value not found in the article commonly used and not required by the use to which the ordinary article is commonly put; or it may be something which pleases not so much because of the qualities which make it useful as because of characteristics which appeal to the taste and to the fancy. "Fancy" is the antonym of "plain," "common," "ordinary," "staple," and to say that a thing is fancy necessarily implies that it has a value or characteristics not found in the articles of simpler type. There is nothing esthetic or fanciful about the goods in controversy, and in them is no quality or virtue which is not found in the ordinary safety match in general use. They are flimsy, safety matches, and beyond the fact that they are small, ordinarily cost nothing to the consumer, lie flat in the package, and may be conveniently carried, there is nothing about them which would recommend them to the consumer. Far from having any special value they are an inferior grade of match which is not sold but given away to smokers and which is not worth half as much as a good lucifer match. The fact that the sticks or stems of the matches are stained and that they are presented to the consumer in booklets can not be regarded as giving a character to the goods which would justify their designation as fancy matches. Indeed, that principle was recognized by the board itself in the Sheldon case, when it held that better matches with stained sticks put up in boxes and better matches with plain sticks put up in booklets were not fancy matches. Stained or unstained the matches are sold to the dealer for the same price and their transformation into a fancy match can not be effected by putting them up in a booklet which advertises many kinds of goods rather than in a box which advertises matches only. The manner of putting up the matches might possibly give them the character of a novelty, but certainly by itself it would not be sufficient to make out of them a fancy article.

The contention that all safety matches are fancy matches is not supported by any sound reason and can not be sustained. The evidence tends to show that 90 per cent of all the matches imported are safety matches, and that they have been in common use in this country for 25 years. Prior to the passage of the tariff act of 1909 these matches were apparently classified as friction matches, and if Congress had intended to take them out of that classification and to impose upon them a higher rate of duty it does seem that they would have been provided for under the name by which they were commonly and

generally known rather than under a designation which all the witnesses agree was never applied in the trade to the safety match. When a duty of 35 per cent ad valorem was laid on fancy matches Congress intended, in our opinion, to subject to that duty only those matches which as matches served some purpose which could not be met by the ordinary match, and that interpretation of the legislative will seems to be borne out by the fact that fancy matches are enumerated with wax matches and tapers, each of which performs a function which could not be performed by the ordinary match.

The decision of the Board of General Appraisers is *reversed*.

BARBER, Judge, did not participate in this decision.