(C.D. 4372)

KREISS CORP *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 3, 1972)

*Stein & Shostak* (*S. Richard Shostak* of counsel) for the plaintiff.

*Harlington Wood, Jr.,* Assistant Attorney General (*Patrick D. Gill,* trial attorney), for the defendant.

Before RICHARDSON and LANDIS, Judges, and ROSENSTEIN, Senior Judge

LANDIS, Judge: The relatively broad issue in these protests, consolidated for trial, is whether glass vases imported from Japan in 1964 and 1965 are, as plaintiff claims, properly classifiable under TSUS (Tariff Schedules of the United States) item 546.35 as glassware,

colored prior to solidification, and characterized by random distribution of numerous bubbles, seeds, or stones, throughout the mass of the glass and, therefore, not classifiable, as liquidated by customs, under TSUS item 546.51 as glassware, *inter alia*, not so colored and not so characterized, throughout the mass of the glass. Customs assessed duty at 50 per centum ad valorem. The duty rate under plaintiff's claimed TSUS item 546.35 is 25.5 per centum ad valorem.

Classification under TSUS items 546.35 and 546.51 is provided for in schedule 5, part 3, subpart C of the tariff schedules in pertinent context as follows:

SCHEDULE 5. – NONMETALLIC MINERALS AND PRODUCTS
Part 3. – Glass and Glass Products

SUBPART C. – GLASSWARE AND OTHER GLASS PRODUCTS

\*       \*       \*       \*       \*       \*       \*

Articles chiefly used in the household or elsewhere for preparing, serving, or storing food or beverages, or food or beverage ingredients; smokers' articles, household articles, and art and ornamental articles, all the foregoing not specially provided for:
Glassware made of glass containing by weight over 24 percent lead monoxide:

\*      \*      \*      \*      \*      \*      \*

Glassware, other than the foregoing, decorated with metal flecking, glass pictorial scenes, or glass thread- or ribbon-like effects, any of the foregoing embedded or introduced into the body of the glassware prior to its solidification; millefiori glassware:

\*      \*      \*      \*      \*      \*      \*

| | | |
|---|---|---|
| 546.35 | Glassware, other than the foregoing, colored prior to solidification, and characterized by random distribution of numerous bubbles, seeds, or stones, throughout the mass of the glass_____ | 25.5% ad val. |
| \* \* \* | Glassware, other than the foregoing, pressed and toughened (specially tempered), chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients _____ | \* \* \* |
| | Other glassware:<br>    Valued not over $1 each: | |
| | \*      \*      \*      \*      \*      \*      \* | |
| 546.51 | Other _____ | 50% ad val. |

Before reviewing the record, we best set forth the legislative background cited by counsel on both sides, explaining that the above classifications of glassware:

> \* \* \* [divide] the glassware into four general categories—categories based on the character of the glass itself: (1) glassware containing over 24 percent lead oxide; (2) that containing metal flecking; (3) that containing numerous bubbles, seeds or stones throughout the mass of glass; and (4) all other glassware. These four general groups are further broken down into value brackets and in some instances the value brackets themselves are subdivided. The current provisions for these articles are the result of a number of trade-agreement concessions. These concessions have subdivided paragraph 218(f) into a number of confused and overlapping classifications based upon value, type of ware, use, and decoration. The proposed provisions reorganize the existing provisions into an orderly system of mutually exclusive descriptions.[1]

> \*    \*    \*    \*    \*    \*    \*

> The description of "bubble" glassware (item 546.35) has been clarified. The existing provisions for such glass was originally based upon a concession in the bilateral trade agreement with Mexico and covered Mexican bubble glass. Such glassware is characterized by a very substantial number of bubbles, seeds and stones through the mass of the glass. In the proposed language it is believed there is provided a clearer definition of the ware to be covered. The provision for production otherwise than by automatic machine does not furnish a useful distinction and has been eliminated.[2]

[Additional Explanatory Notes and Background Material.] [3]

> Item 546.35 – Bubble glass. A question arose as to whether the Commission's description of bubble glass is a departure from existing practice with respect to the classification of certain Italian glassware. It is the Commission's intention and belief that this description will continue the existing tariff treatment as reflected in CIE's 312/48; 1741/56. The words "numerous" and "haphazard" in the article description and the original explanatory notes were used to convey the idea that the glassware contains no refining materials, deviates from regularity of design and contains uncontrolled bubbles, cords, seeds, and striae.

> Examination of samples of the Italian glassware in question clearly indicated that it is comparable to Mexican bubble glass and would clearly be within the scope of item 546.35.

> We are advised that the Italian and Mexican glass are made by the same process. In both cases most of the glass is hand-made, and the bubbles are a natural consequence of impurities in the glass. In both cases there is no control applied to increase or reduce the number of bubbles in the glass. The number of bubbles will

---

[1] Tariff Classification Study, Schedule 5, page 141.
[2] *Id.* at page 143.
[3] Tariff Classification Study, Seventh Supplemental Report, page 101.

vary according to the extent of the impurities and according to the part of the furnace from which the glass in a particular piece was drawn, i.e., the nearer to the bottom the more impurities and the more bubbles. While a given piece of Italian glass may vary from a given piece of Mexican glass as to the number and size of bubbles evident to the naked eye, we know of no way to make any meaningful distinction between the two products in terms of ingredients, production process, general appearance or market served.

On trial at Los Angeles, plaintiff adduced testimony from two witnesses and introduced in evidence five exhibits (exhibits 1 through 5). Defendant introduced two exhibits (exhibits A and B) and called one witness to testify.

It is stipulated that exhibit 1 is a representative sample of the assortment of vases in protest 67/3200, identified on the invoice as item K–932. Exhibit 1 is a vase of reddish-orange color. The lip or rim (which is fluted) and the lower part of the vase reflect a deeper hue of the color that blends lighter in the body of the vase. The base of the vase, which shows as clear uncolored glass, mirrors the cast of the orange color. There are noticeably visible bubbles of assorted sizes in the glass.

The record establishes that the vase involved in protest 65/23967 is the manufacturer's invoice item K–908. Exhibit 2 is a vase identified as item K–977, not involved in this litigation, which plaintiff's witness testified was made by the manufacturer of item K–908. The blue color of exhibit 2 blends in the same fashion as that described for exhibit 1. The rim is fluted and the clear uncolored base of the vase mirrors the cast of the blue color. There are bubbles in the glass. Defendant, after *voir dire* examination of the witness testifying as to exhibit 2, stated "we would accept this piece of glass as representative of * * * [item K–908] * * * [w]ith the limitation that this is not entirely clear, and we will develop it with later testimony, that the bubbled portion of the several layered glass, of which samples are not present, contains bubbles throughout the mass."

Exhibits 3 and 4 are samples of Italian glassware from Empoli, Italy. Exhibit 5 is a sample of Mexican glassware.[4]

Defendant's exhibits A and B are samples of glassware concededly of a kind classified under paragraph 218(f) of the Tariff Act of 1930, as modified, as articles composed wholly or in chief value of glass, commercially known as bubble glass.[5]

Mr. Hirao Nagase, import manager of Kreiss Corporation, plaintiff in this case, is the witness who identified exhibit 2 (item K–977) in

---

[4] Exhibits 4 and 5 are broken.

[5] See, *Edward P. Paul & Co., Inc.* v. *United States,* 53 Cust. Ct. 92, C.D. 2478 (1964) (discussing glassware, commercially known as bubble glass).

connection with the disputed classification of item K–908. He stated that his firm did not have a sample of item K–908 and while he had not seen how K–908 was made, he had observed how K–977 was made at the place of manufacture in Japan. Asked if item K–908 was produced in a manner any different from item K–977, except for the different colors highlighted in the design of K–908, he stated "[n]ot at all." Mr. Nagase also testified that he knew nothing about the ingredients of the melted glass from which item K–977 was produced; that he did not know if the temperature of the melted glass was controlled in any way, and that he was not familiar with the process in the glass industry known as "fining".

For the record, Mr. Nagase further stated that, at the factory in Japan, he observed that item K–977 was made of melted glass from two kilns, one containing melted blue glass, the other melted clear crystal glass. The tenor of Mr. Nagase's testimony reflects his obvious difficulty of expression in the English language. His description of how item K–977 was made, while not too clear, is substantially the same as that described by defendant's witness Mr. Peterson, as follows:

> Glass such as this [exhibits 1 and 2], a vessel such as this, a glass maker would take a hollow tube called a "blow pipe," he would dip it into a glass pot, would gather on the end a small lump of glass of the size that he wanted, for the object he wanted to make, and he would blow a bubble—again, depending upon the size he desired—perhaps the size of a baseball, or a tennis ball; then he would condition that glass, so that it was the proper temperature, and move it over to the next tank, and would dip it in and cover that ball with a layer of clear glass. He then could or could not put this in a mold and blow it to shape. The mold would have a shape quite similar to this, including the base; or, he could place this on a marriaging steel plate and form this by rolling; he then would attach——
>
> JUDGE WATSON: He could form the shape of Plaintiff's Exhibit 2 by molding; is that right?
> THE WITNESS: Yes, it's possible, by molding. By molding, and by the method I just described.
>
> A. (continuing) The glass maker or his assistant, would then attach a pontil rod on the end of this; would hold it upside down, or would pull the glass to lengthen it to the proper length; he then could cut it off with shears and form these flutes while it was hot.
> I omitted one thing: he would fire polish this before he pulled it down—these are the flutes * * *.

According to Mr. Nagase the manufacturer's item K–908 in this case (which he had not seen made) was produced in a fashion similar to exhibit 2 (item K–977) except that it is decorated to "accent" different colors by dipping the blue ball into a kiln of green, red, or

yellow melted glass "just a little bit" and then into the kiln of melted clear crystal glass. When the ball for item K–908 is blown into the mold, Mr. Nagase said it forms a free-form accent of colors and "if you do add the third colors, then you have to say [there are] three layers" of glass "[n]ot all over the place, just part of it"; and because it is melted glass, "it makes [a] smooth surface" with no part "heavier than the other part". Exhibit 1, Mr. Nagase said, is made exactly the same way as exhibit 2, except that a special mold is used to get the decoration of concentric spaced controlled bubbles that encircle the body of the vase (exhibit 1).

Looking at exhibits 1 and 2, Mr. Nagase stated that he could see bubbles "all over" the vases, including the white portion of the base of the vases. The purchase order for exhibit 1 specified the presence of the decorative controlled bubbles, but not the uncontrolled bubbles in exhibits 1 and 2. His firm knew "for sure" that exhibits 1 and 2 would have uncontrolled bubbles in the glassware "even though we do not want them to make" bubbles. Mr. Nagase said that, in his opinion, the factory he visited could not make glassware without bubbles; that he had never seen factory produced glassware that did not have bubbles, and that exhibits 1 and 2 were colored prior to solidification.

Mr. Nagase finally identified exhibit 3 (colored yellow) as an item which he had purchased in Empoli, Italy, made "just about the same way" as exhibits 1 and 2, except exhibit 3 is only one layer of glass.

Plaintiff also called as its witness Gerald E. Rankin, the customs import specialist assigned to classify glassware at Los Angeles. Mr. Rankin testified that he had seen glassware similar to exhibit 3 (Italian glassware), and for the reason that glassware of the type of exhibit 3 varied from one shipment to another "no two pieces are exactly the same" he "very likely" classified it two different ways. Sometimes, he said, he classified glassware similar to exhibit 3 under TSUS item 546.35 (as glassware colored prior to solidification, etc.) "but in other instances * * * [he] may have classified it" under tariff items for glassware other than TSUS item 546.35. Asked what determined how he classified the glassware, Mr. Rankin stated that in shipments of the type of exhibit 3, customs examines six or seven or even twelve samples from the shipment; that while some individual pieces of the glassware would very likely be classifiable under different tariff items, including TSUS item 546.35, he had "to judge the entire shipment as a whole." Mr. Rankin also stated that the number of bubbles in the glassware is a factor in the classification of exhibit 3; that it comes from Empoli, Italy, is also a factor, and the glassware has to be colored throughout the mass of the glass. Mr. Rankin was of the opinion that exhibits 1 and 2 were not colored throughout the mass of the glass, because if one were to break exhibits 1 and 2, some of the pieces would be

colorless glass. (It may be well to note that Mr. Rankin, a customs official, was called by plaintiff as its own witness. His testimony, which negates an essential element of plaintiff's claim, and which is not substantially contradicted by any other evidence, points up an inherent weakness in plaintiff's affirmative case.)

The witness was questioned by the trial judge as to what other criteria or standards he used to advisorily classify glassware under TSUS item 546.35, and testified that, upon instructions from his administrative superior customs officers, the country of origin is a standard, and the thickness of the glass "has something to do with it, because the thicker the glass the more bubbles you will see in the glass." He uses the same standards for all glassware.

Mr. Rankin volunteered that when "we classify bubble glass we always classify it with a great deal of shaking in boots." Sometimes, Mr. Rankin said, he is forced to classify glassware from Empoli, Italy, against his better judgment because he is instructed that many factories located in Empoli "are traditionally bubble glass manufacturers."

As to the term "numerous" in classifying TSUS item 546.35, Mr. Rankin stated that he does not count the bubbles to determine if the bubbles are "numerous", but simply looks at the piece objectively and makes a subjective judgment that the bubbles are, or are not "numerous" based on what he sees. Asked how he would advisorily classify exhibits 3 and 4 from Empoli, Italy, Mr. Rankin stated that "[i]n the interest of uniformity the Bureau [of Customs] has asked us to classify this type of merchandise from Empoli as bubble glass", although he has classified vases of the type of exhibits 3 and 4 as other than bubble glass. He has classified some glassware from Japan under TSUS item 546.35.

Testifying as to exhibit 2, Mr. Rankin stated that while he could not tell whether it had numerous bubbles throughout the mass of the glass, he knew it had numerous bubbles in at least one layer of glass. Considering the thickness of the base of exhibit 2, and holding it up to the light, he could not say that the bubbles in the base were necessarily numerous. Asked if exhibit 2 had in excess of 50 bubbles in the base area and more than 50 bubbles in the "rest of the vase", Mr. Rankin replied: "Yes." He stated that, as he understands the Bureau's position, "glassware that does not have all of the portions colored prior to solidification" is not classifiable as bubble glass.

Mr. Jack L. Peterson, owner of his own consulting firm offering services to manufacturers of nonmetallic materials, such as glass, testified for defendant. He testified that his firm has done business in California, Connecticut, and in Japan; that he is a graduate ceramic engineer from Alfred University, Alfred, New York; that he had

44

done some graduate work at the University of California, and that he has been in the field of ceramic engineering 19 years. Ceramic engineers, according to Mr. Peterson, attempt to organize the materials and the people used in the nonmetallic or silicate industry to efficiently manufacture an object, a product. The silicate industry, he said, includes those industries that manufacture brick, refractories, floor and wall tile, dinnerware, and all types of glass. The ceramic engineer assists the manufacturer in determining the qualities of particular chemicals that might be used to make a particular product. Mr. Peterson stated that, in the regular course of his business, he had visited many plants inside and outside the United States, and had been personally involved with the supervision or engineering aspects of the glassmaking industry. He was familiar with the glassware produced in the United States on the limited basis to which he proposed to testify. Mr. Peterson testified that he had seen Mexican bubble glass made, had purchased it, and was familiar with much of the chemistry involved in the manufacture of Mexican bubble glass. He had had no contact with glassware to which he applied the term "bubble glass", made elsewhere than in Mexico, and would not call it bubble glass.

Mr. Peterson identified exhibit A, received as representative of Mexican glassware, as glassware similar and typical in appearance to glassware imported at Los Angeles from Mexico. For the record, he stated that exhibit A was hand-blown glass (a drinking glass); fire polished on the top; made from a poorly "fined" batch of glass with a random distribution of a great many different size bubbles. Exhibit B he described as a light-green colored article of glassware, shaped like an "Ehrlemeyer flask", showing a random distribution of a great many bubbles of assorted sizes, characteristic of Mexican bubble glass.

Mr. Peterson said he was familiar with the manner in which glass, of the kind involved in this litigation, is made in Japan. He described exhibit 1 as a vase, "probably hand-blown, first with a red, probably, selenium, and then dipped in a second furnace with a clear glass; placed in a mold with an organized pattern of projections or needles to form the lower sections; it's then cut off and probably fire-polished and then tools [are] used to push the vessel inward to make the fluting" in the rim of the vase. He stated that the assorted sizes of visible bubbles from bottom to top appear to be organized or controlled bubbles. The word "fining", which he had used in describing exhibit A, Mr. Peterson said, is related to the chemicals used in the furnace to make melted glass, in color or not in color. He explained that when the chemicals are heated to a "melt", air is trapped around

the surface of each of the particles that composes the powdered chemicals and in the melting process gases are evolved off. One of the primary gases evolved in the melt is carbon dioxide, but there can be others evolved from the walls of the container holding the melt. The two important ways of eliminating the gas from the glass, according to Mr. Peterson, are: first, by timing the melt and, in some cases, chemicals can be added to help speed up the time process. Fluorine, he said, is an example of a chemical that would speed up the process by reducing the viscosity of the glass so that the bubbles can rise through the melt more quickly. The second way is to increase the temperature of the melt so that after a period of time the bubbles have all gotten together, become large, or have risen to the top whence the bubbles go off into the air or atmosphere of the furnace. The whole process is called fining. The fining processes that Mr. Peterson was acquainted with in Japan involved timing the melt and controlling the temperature. There are, Mr. Peterson stated, relative degrees of fining and one of the primary reasons that Mexican glass has so many bubbles in it, is that it is not fined to as great a degree as a more sophisticated glass that might have many less bubbles.

Exhibits 1 and 2, in Mr. Peterson's opinion, were more sophisticated, with respect to fining, than exhibit A or B, and similar in sophistication to exhibits 3 and 4, with respect to fining. The degree of fining, Mr. Peterson stated, determines the number of bubbles the glass will have throughout the mass; a highly refined glass has a minimum number of bubbles.

Mr. Peterson also testified that the presence of bubbles is common in all handmade glass and, although handmade glass can be made to show no bubbles, he would consider it unusual. Mr. Peterson stated that, in his opinion, exhibits 1, 2, 3, and 4 did not show the presence of numerous bubbles. His opinion, he said, was a subjective judgment in relationship to the difference between a very "fine glass," one with a very small amount of bubbles, and one which has a very large amount of bubbles. Sometimes, he said, glass blown in an old mold or a mold with a rough surface appears to be pockmarked on the outside, with just little tiny dimples, the dimples sometimes cause confusion, but they are not bubbles. Exhibit 2, he said, shows pockmarks, approximately three-quarters of the way up from the base, causing a roughness to the surface in the lower part of the vase.

Asked if exhibit 2 has a colorless portion of glass, Mr. Peterson stated that the base was colorless, and described, as quoted, *supra*, how exhibits 1 and 2 were made.

On cross-examination, Mr. Peterson testified that there is Mexican glassware of a higher quality than exhibit A that is still bubble glass,

but he would not apply the term "bubble glass" to the Mexican glass as represented by exhibit 5, which showed bubbles but not numerous bubbles. Mr. Peterson could not define the word "numerous" in terms of numbers and went on to explain that he expects all glass vessels to have bubbles ranging from one to an unlimited number; that high-quality glass would have much less visible bubbles than low-quality glass; that the relative or subjective scale ranges from zero to one hundred with high-quality glass being zero and low-quality glass, such as exhibit B, having one hundred bubbles. There is, according to Mr. Peterson, glassware of worse quality than exhibit A with respect to bubbles. Mr. Peterson agreed that exhibit 4 has several hundred bubbles in it but remained of the opinion that the bubbles were not numerous in exhibit 4, and persisted that he could not give a numerical value to the term "numerous". The glassware would not have to look like exhibit A for the glassware to have "numerous" bubbles. The cut off, said Mr. Peterson, is "purely subjective", and he had no commercial dealings in glassware of the type of exhibit 4.

As to the color in exhibits 1 through 4, Mr. Peterson testified that parts of the mass of the glass of exhibits 1 and 2 are uncolored and all the parts of the mass of the glass of exhibits 3 and 4 are colored.

Upon that testimony, there ensued the following questions and answers:

Q. Mr. Peterson, would you agree, with respect to Plaintiff's Exhibits 1 and 2, that with the absence of the base, the balance of those exhibits are colored?—A. No.

Q. They are not?—A. No. I would——

Q. What portions, aside from the base, are not colored?—A. I can't tell you.

Q. How can you answer then?—A. I can answer it, because I would believe, from my knowledge, that these were made from two gathers of different colored glass. This would lead me to suspect that the outside portions of the upper sections of the vessel are not colored; but I can't prove it.

Q. Well, looking at the items——A. Yes, sir.

Q. ——as a layman, and as a collector——A. Yes, sir.

Q. ——aside from the base portions——A. Yes, sir.

Q. ——would you say that these vases, Exhibits 1 and 2, aside from those portions, are colored or not?

\*      \*      \*      \*      \*      \*      \*

A. If the base was off of this, I could not tell the difference, nor could I tell the difference in Exhibit No.——

JUDGE WATSON: Exhibit 2?

THE WITNESS: Two.

Q. Does that mean that as far as you are concerned, with the bases off they are colored?—A. Yes, sir.

47

With respect to the effect the process of "fining" had on the number of bubbles in glassware, Mr. Peterson stated that the greater the degree of fining, the less the number of bubbles; that the type of material used in the melt of the glass and viscosity of the material would also be a factor in the number of bubbles; and that, all other things equal, glassware that has a higher degree of fining would be more expensive glassware. He remained of the opinion that exhibits 1, 2, 3, and 4 were relatively equal in respect to the degree they had been fined. When finally asked if he had any familiarity with Italian bubble glass, or merchandise which you would consider to be bubble glass from Italy, Mr. Peterson in effect replied, "[n]one at all."

We have summarized the testimony set forth above at greater length than perhaps necessary, if for no other reason than to illustrate the apparent difficulties indigenous to the classification "glassware, * * * colored prior to solidification, and characterized by random distribution of numerous bubbles, seeds, or stones, throughout the mass of the glass." The difficulties would, however, appear to be comparable to those posed by the descriptive term "fancy" in the classification of leather and matches under the 1930 and 1909 Tariff Acts. *United States* v. *Pacific Binding Library Co.*, 22 CCPA 641, T. D. 47617 (1935); *United Cigar Stores Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 66, T.D. 33311 (1913); see also, *Sheldon & Co.* v. *United States*, 2 Ct. Cust. Appls. 275, T.D. 32032 (1911). We do not discuss the difficulties alluded to in the testimony and, on this record, overrule the protests on the narrow grounds next discussed.

Plaintiff postures that the samples and the testimony of record clearly establish that, definitive with the description in TSUS item 546.35, the imported vases are glassware of a kind colored prior to solidification, and characterized by random distribution of numerous bubbles, seeds, or stones, throughout the mass. Plaintiff further attacks the customs administrative position, alluded to in the record, that the term "colored prior to solidification" requires that the glassware be wholly colored prior to solidification (i.e., colored prior to solidificatin, throughout the mass), on the sole ground that if such requirement were intended, "it would have been a very simple matter to so state." Going beyond these arguments we perceive no inclination on the part of anyone to disagree with plaintiff's conclusion that the legislative history quoted, *supra*, is no warrant for limiting classification under TSUS item 546.35 to glassware from Mexico and Italy.

As to exhibit 1, exhibit 2 and item K–908, there is little that can or need be said. The record establishes that the imported vase, represented by exhibit 1, has a distribution of controlled bubbles and a dis-

48

tribution of random bubbles. Indeed, as defendant points out, the vase is more characterized by the controlled distribution of bubbles than it is by the random distribution of bubbles. We are of the opinion that the presence of controlled bubbles in glassware, for whatever reason, is incompatible with the classifying description in TSUS item 546.35, *inter alia*, specifying "glassware * * * characterized by random distribution of numerous bubbles, seeds, or stones, throughout the mass of the glass", and so hold.

Exhibit 2, in evidence, is not the imported glass vase (item K–908, protest 65/23967), the classification of which we must decide. There is no evidence that either exhibit 2 or item K–908 is an article of glass, colored prior to solidification, and characterized by random distribution of numerous bubbles, seeds, or stones, throughout the mass. The testimony adduced by plaintiff is clearly insufficient to overcome the presumption that customs correctly classified imported item K–908.

Plaintiff not having proved that the imported glassware has the special indicia of the glassware classified under TSUS item 546.35, the protests are overruled. Judgment will be entered accordingly.