**INTERNATIONAL SEÂWAY TRADING CORP., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5523.**

United States Court of Customs and Patent Appeals.

Dec. 29, 1973.

Sharretts, Paley, Carter & Blauvelt, New York City, Attys. of Record, for appellant; Eugene F. Blauvelt, New York City, of counsel.

Irving Jaffe, Acting Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Joseph I. Liebman, New York City, for United States.

Lamb & Lerch, New York City, amicus curiae; David A. Golden, Richard J. Kaplan, New York City, of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

LANE, Judge.

This appeal is from the decision and judgment of the United States Customs Court, First Division, 69 Cust.Ct. 38, 349 F.Supp. 1019, C.D. 4375 (1972) overruling appellant's protest against the classification of footwear invoiced as "Basketball High Shoes" under item 700.60 of the Tariff Schedules of the United States [TSUS] as "[f]ootwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber * * * : Other" and assessed at 20% ad valorem. Appellant claims the merchandise should be classified under item 700.70, TSUS, as "[f]ootwear * * * [w]ith soles of material other than leather: [w]ith uppers of vegetable fibers," at a duty of 15% ad valorem. Involved in the controversy is Schedule 4, Part 4, Subpart B, Headnote 2 [hereinafter cited as Headnote 2], which reads:

2. For the purposes of the tariff schedules, the term "rubber" means a substance, whether natural or synthetic, in bale, crumb, powder, latex, or other crude form, which can be vulcanized or otherwise cross-linked, and which after cross-linking can be stretched at 68° F. to at least three times its original length and which, after having been stretched to twice its original length and the stress re-

moved, returns within 5 minutes to less than 150 percent of its original length, and includes such substance whether or not containing fillers, extenders, pigments, or rubber-processing chemicals.

The nature of the "Basketball High Shoes," apparently made with heavy midsoles for training purposes, may be seen from certain stipulated facts and from Defendant's Collective Exhibit "A", which is a copy of U. S. Customs Laboratory Report No. S 12355, referred to in the following stipulation.

The stipulation reads:

1. The uppers are of vegetable fibers.

2. The footwear is in no part of leather.

3. The midsoles of the instant footwear contain, as components, among other things, "Natural Rubber RSS" and "Synthetic Rubber". That "Natural Rubber RSS" and "Synthetic Rubber" are subtances, whether natural or synthetic, in bale, crumb, powder, latex, or other crude form, which can be vulcanized or otherwise cross-linked, and which after cross-linking, can be stretched at 68° F. to at least three times its original length and which, after having been stretched to twice its original length and the stress removed, returns within 5 minutes to less than 150% of its original length.

4. Both parties agree to be bound by a determination by the Customs Laboratory as to whether the vulcanized so-called iron powder midsole material can be stretched to three times its original length.

5. Defendant's Collective Exhibit "A" is correct in its determination of the relative weights of the respective materials insofar as they were therein determined.

Defendant's Collective Exhibit "A" (Customs Laboratory Report No. S 12355) includes the following statements:

The midsoles in their present condition (containing the iron powder) are

not capable of being stretched to three times their original length. In our opinion the rubber hydrocarbon of the midsole would conform to the physical requirements of the term "rubber" as defined in Headnote 2, Subpart B, Part 4, Schedule 4 of TSUSA 1969.

The weight of each sneaker minus the lacing was found to be 272 grams (left sneaker) and 283.5 grams (right sneaker). The midsoles were found to weigh 156.5 grams (left sneaker) and 169.2 grams (right sneaker). Three tests on the midsole of the left sneaker showed an average of 89% by weight of iron and iron oxide. This is equivalent to 51.2% by weight of the left sneaker minus the lacing. Assuming 89% by weight of iron and iron oxide in the right midsole, the right sneaker minus the lacing contains 53.1% iron and iron oxide.

\* \* \* \* \* \*

Three tests on the midsole of the right sneaker showed an average of 89.5% by weight of iron and iron oxide. This is equivalent to 53.4% by weight of the right sneaker minus the lacing.

Oral testimony by two witnesses for the United States and additional exhibits were also considered by the trial court.

The Customs Court regarded the issue in this case to be whether the midsole material, which according to the Customs Laboratory Report constitutes over 50 percent by weight of the imported footwear, consists solely of "rubber" as defined in Headnote 2, quoted above. The court below construed Headnote 2 as referring to all substances in crude form, whether or not containing fillers, extenders, pigments or rubber-processing chemicals, which are capable of being cross-linked and of meeting the requisite tests.

In this interpretation, the Customs Court disagreed with the Government and with the amicus curiae. The Government takes the position that to be "rubber" within the meaning of Head-

note 2, it is only necessary that a substance contain a natural or synthetic rubber which in crude form, *before adding* any fillers, extenders, pigments or rubber-processing chemicals, is capable of being cross-linked and, thereafter, of meeting the specified stretch and return tests. As to the midsole in the imported basketball shoe, the Government and the amicus curiae contend that the entire midsole is "rubber" under the Headnote 2 definition because the specified stretch and return tests should apply only to the precursor natural and synthetic rubber materials (without filler) used in the manufacture thereof and the stretch and return tests do not apply to the finished midsole.

Even though the Customs Court on the one hand and the Government and amicus on the other hand employed different interpretations of Headnote 2, they were in agreement that the classification of the imported shoes as footwear *which is over 50 percent by weight of rubber* under item 700.60, TSUS, was correct. The court below found that appellant had not demonstrated that the midsole material in crude form (with an actual composition of about 10 percent by weight natural and synthetic rubber and about 90 percent by weight iron powder) could not have been vulcanized or cross-linked in such a manner as to pass the stretch and return tests even though the actual samples submitted to the Customs Laboratory could not pass those tests. Thus, the Customs Court imposed on the importer the burden of proving a negative—that the midsole material could *not* have been cross-linked by another process to yield a cross-linked mixture which would, in fact, pass the stretch and return tests. We take a different view of this crucial aspect of the case.

Our disposition of this appeal will focus on the midsole portion of the imported shoes since the midsole constitutes over 50 percent by weight of the total weight of each shoe. Both parties agreed to be bound by a determination of the Customs Laboratory as to wheth-

er the imported midsoles are capable of being stretched to three times their original length. The Customs Laboratory determined that the imported midsoles are *not* capable of being stretched to three times their original length.

■ We hold that appellant met its burden of proof regarding the impropriety of the Government's classification by evidence in the form of the Customs Laboratory report. We find that there is no evidence in the record showing that the Government, thereupon, met its burden of going forward to prove that the cross-linking could have been performed by *some other method* so that the midsole mixture would meet the stretch and return tests. It may be that in this case, involving as it does a mixture containing nearly 90 percent by weight of iron powder, the Government would be hard-pressed to make such an affirmative showing.

■ We agree with the Customs Court that the correct interpretation of Headnote 2 is that "rubber" means a substance in crude form, whether or not containing fillers, extenders, pigments, or rubber-processing chemicals, which is capable of being cross-linked and, thereafter, of meeting the specified tests. However, the Customs Court is in error in its statement that there is not a scintilla of evidence that the midsole mixture was incapable, after cross-linking, of meeting the stretch and return tests. That is what the Customs Laboratory report is all about. The Customs Court makes a distinction without a difference by treating the *finished midsoles* as something different from the vulcanized midsole mixture for the stretch and return test requirements of Headnote 2. Moreover, the statement of the Customs Court places on appellant the burden of demonstrating that *all other methods* of cross-linking the midsole mixture would produce materials which would fail the stretch and return tests. Such a burden would neither be practical nor fair, particularly in view of the stipulation of the parties agreeing to be bound by a determination of the Customs Laboratory as to whether the instant vulcanized midsole could meet the stretch test.

■ The interpretations of Headnote 2 urged by the Government and by the amicus curiae require that only the "Natural Rubber RSS" and the "Synthetic Rubber" components (*excluding* the filler) of the midsole mixture be capable of being cross-linked and thereafter passing the stretch and return tests; whereas the filler is *included* for purposes of the weight determination under item 700.60, TSUS. In other words, they urge that the iron powder filler be excluded when making the qualitative chemical identification under Headnote 2, but that the iron powder filler be included when making the quantitative weight determination under item 700.60, TSUS. We think these interpretations are inconsistent. Such inconsistency should not be imputed to the Congress in the absence of clear evidence of intent —evidence which does not appear in the record or briefs.

Alternatively, the Government contends that appellant failed to establish that the imported merchandise was not over 50 percent by weight of "plastics." We will not consider this contention raised for the first time on appeal. The Customs Court did not address this "plastics" question in its opinion, and the record before it dealt entirely with the "rubber" question. Since the Government's alternative contention entails a new issue which was not raised previously, we see no basis for entertaining it at this stage of the case.

■ Finally, we come to appellant's claim that the proper classification of the imported shoes is item 700.70, TSUS, "[f]ootwear, with uppers of fibers: [w]ith soles of material other than leather: [w]ith uppers of vegetable fibers." Appellant has carried the burden of proving that item 700.70 is the proper classification by virtue of the facts stipulated by the parties, quoted above. The imported shoes are footwear with uppers of vegetable fibers and no part of the footwear is leather. Therefore, the proper classification of the im-

ported merchandise is item 700.70, TSUS. The judgment of the Customs Court is reversed.

Reversed.

RICH, Judge (concurring).

I fully agree with Judge Lane's opinion but wish to add the following considerations.

The importation consists of footwear and the issue is whether it is to be classified in TSUS 700.60 or TSUS 700.70. This, in turn, depends on whether plaintiff has sustained its burden of proving that the footwear is not "over 50 percent of rubber." In determining this seemingly simple fact question, the court below, both parties, and amicus are in agreement that the definition of "rubber" in Schedule 4, Part 4, Subpart B, Headnote 2, is controlling as to the meaning of "rubber." Indeed, the headnote itself states that "For the purposes of *the tariff schedules,* the term 'rubber' means a substance" meeting certain stated requirements. (My emphasis.) That definition of "rubber" has produced chaos.

Since the Tariff Schedules have provided in Headnote 2 a statutory definition of "rubber" which is not only controlling here but obviously intended to apply to every item in the TSUS referring to "rubber," that definition is potentially of vast importance to future tariff questions.

There has been an unusual amount of judicial confusion in this case over the interpretation of Headnote 2. I think this stems from its unfortunate grammatical construction, which appears to have led the lower court into results we have found to be incongruous.

Headnote 2 is one of the two headnotes to "Subpart B.—Rubber." Headnote 1 provides that "This subpart covers all rubber * * *." That being so, Headnote 2 cannot, as a matter of common sense, be limited to "crude" rubber as the Customs Court appears to have thought. Yet the literal reading of Headnote 2 makes it appear to apply only to crude rubber. If rubber is being defined for the purposes of *all* the tariff schedules, many of which cover products made of or containing rubber in which the rubber is, of necessity, *not* crude but in its finished state—vulcanized, cross-linked or whatever else it may be called —then it must have been the intent of Congress to write a definition that applies to both crude and vulcanized rubber.

The transition point, so to speak, between crude and vulcanized rubber is the point where cross-linking occurs. It is to be noted that Headnote 2 itself deals with substances on both sides of this transition point. It first speaks of a substance in "crude form" which *can* be vulcanized or otherwise cross linked; it next speaks of a substance which, *after* cross linking, is capable of meeting specified stretch and stretch-and-return tests. Reading Headnotes 1 and 2 *in pari materia,* one must read Headnote 2 defining "rubber" both before it is cross linked and after it is cross linked—i. e., "all rubber," as Headnote 1 commands.

The unfortunate grammatical construction, to which I have referred and which I think we should ignore in order to carry out the obvious intent of Congress, is, first of all, the placement of the word "which," first occurrence. If it be advanced from its position just before the words "can be vulcanized" to precede the enumeration of various crude forms of rubber, the beginning of the headnote would then read:

For the purposes of the tariff schedules, the term "rubber" means a substance, whether natural or synthetic, which, in bale, crumb, powder, latex, or other crude form, can be vulcanized or otherwise cross-linked * * *.

The *only* form of rubber which *can* be "vulcanized" or otherwise cross linked is a substance in a crude form because after cross-linking it is no longer "crude." Cross-linked rubber cannot be cross linked. That, however, is only the first part of the test a "substance" *in crude form* must meet to qualify as crude "rubber." The cross-linked material

must then meet the stretch tests too, else the crude substance is not crude "rubber."

If, however, we are dealing with an importation involving a cross-linked substance, as distinguished from a crude substance, as we are in the present case, then, I think, the language of the headnote must be applied thus (emphasis mine):

> * * * the term "rubber" means a substance * * * which *after* cross linking can be stretched at 68° F. to at least three times its original length and which, after having been stretched to twice its original length and the stress removed, returns within 5 minutes to less than 150 percent of its original length, *and includes such substance whether or not containing fillers*, extenders, pigments, or rubber-processing chemicals.

I read the final clause "and includes * * * chemicals" to mean the same thing whether positioned as it is or whether it be construed as though the word "substance" in the first line above were followed *directly* by the clause", whether or not containing fillers, extenders, pigments, or rubber-processing chemicals." But not all of my colleagues so read it. This is a second unfortunate construction.

A stipulated fact in this case is that the *midsoles* have been vulcanized or otherwise cross linked. It is also stipulated that both parties will be bound by the finding of the Customs Laboratory as to whether this "so-called iron powder midsole material can be stretched to three times its original length." The laboratory finding was that it cannot be so stretched.

I agree with the Customs Court that whether the midsole material is or is not "rubber" for purposes of the tariff schedules depends upon whether *it* meets the standards of Headnote 2. My point of disagreement with the lower court is in its apparent belief that those standards apply *only* to material in *crude* form. I also have to disagree that there

"is not a scintilla of evidence" that the midsole mixture (elastomer plus iron powder), in crude form or otherwise, was, *after* cross linking, incapable of meeting the stretch tests of Headnote 2. The stipulated fact is that it *was vulcanized* or otherwise cross linked when imported and the Customs Laboratory found that it was *incapable* of meeting the stretch tests of Headnote 2.

As I read Headnote 2, I have to reject the argument that in testing the midsole material for compliance therewith one should ignore the principal component of that material—the iron powder, which is a "filler." Under the headnote the term "rubber" includes a cross-linked material (10%) and filler of iron powder (90%). It is not technically possible, I believe, to add "filler" to a cross-linked or vulcanized elastomer; the filler has to be compounded with the crude substance, after which they are vulcanized together. I do not see how the Customs Court can object to the fact that the laboratory stretch tests were performed on the *"finished midsoles."* If one wishes to know whether they are made of "rubber," they cannot be performed in any other way. The stretch tests, as specified in Headnote 2, apply only to cross-linked material—and "whether or not containing fillers."

I have been motivated to state the foregoing because my experience in this case has persuaded me of three things: (1) Headnote 2, which is controlling, is of great importance; (2) Headnote 2 is very confusing; (3) the legislature should clarify Headnote 2. I hope that the judicial disagreement in this case will persuade it to do so before too many more disputes are generated by the headnote.

MARKEY, Chief Judge (dissenting).

The issue is whether the imported shoes are, *for tariff purposes,* more than 50% by weight "rubber." The answer turns on whether the midsole, composed of approximately 10% cross-linked elastomer and 90% iron powder and constituting more than 50% of the weight of

the shoe, must be considered to be "rubber" *for tariff purposes.*

Headnote 2 is our only guide in determining whether the midsole is "rubber" for tariff purposes. Though I find no comfort in Headnote 1, I agree with Judge Rich that the language of Headnote 2 is subject to conflicting interpretations. I opt for what I consider its strict construction.

Paraphrased and stripped of redundant and inapplicable wording, the headnote is being read by the majority as:

> For tariff purposes, the term "rubber" means a substance, whether or not containing fillers, which can be cross-linked and thereafter stretches and returns within certain criteria.

So read, the headnote would require that the midsole itself pass the specified tests. Admittedly, it cannot. Thus, the midsole could not be termed "rubber" and the imported shoes could not be classified as composed of more than 50% by weight of rubber. The majority so holds.

Again paraphrasing and stripping the headnote of redundant and inapplicable wording, I would read it as:

> For tariff purposes, the term "rubber" means a substance, in crude form, which can be cross-linked and thereafter stretches and returns within certain criteria and the term "rubber" means *that* substance whether or not it contains fillers.

So read, the headnote would limit the testing to the substance without fillers. Admittedly that substance here would pass the specified tests and the term "rubber" clearly applies to the substance without fillers. I interpret the provision regarding fillers, etc. as being an add-on or after-thought which says in effect, "if the substance is rubber, it remains rubber, *for tariff purposes,* even though it contains fillers, etc."

I am aware, of course, of the seemingly incongruous result. A midsole, 90% of which is iron powder, is "rubber." The incongruity argument is not per-suasive, however, when the phrase "for tariff purposes" is given its full due. The majority interpretation would, for example, deny the title of "rubber" to an article composed of the elastomer and just enough fillers to cause the article to fail one of the tests by the barest margin. It would be just as incongruous not to call such an article "rubber" in an objective sense.

Because the elastomer portion of the midsole was stipulated to be a substance which "can be" cross-linked and therefore would pass the specified tests and, as I believe, the presence or absence of fillers is irrelevant for tariff purposes, the burden of proof as to other methods of cross-linking is of no moment. If it were, I would fully concur with the majority that the burden should be upon the government.

Similarly, I fully concur with the majority in disregarding the government's arguments regarding "plastics" for the reasons set forth in the majority opinion.

The limited legislative history of Headnote 2, and of neighboring portions of the statute, provides no unerring guide to our decision here. The portion of Headnote 2 relating to "fillers" was removed, without comment, from its position ahead of the portion relating to cross-linking and tests (in an earlier draft) and inserted in its present position at the end of the headnote as passed. Without more, an intent of the Congress should not be found on that fact alone. I am content to take the headnote as it exists and believe it should be read as set forth herein.

In so reading the headnote, I impute no inconsistency to the Congress. Headnote 2 is applicable to all appropriate items of the TSUS, of which item 700.60 is but one. The weight determination under that item and the determination of what is "rubber" are, in my view, entirely separate considerations.

Accordingly, I would affirm the decision of the Customs Court, but for the reasons set forth herein.